MARINE FIRE INSURANCE COMPANY v. JOHN H. BURNETT.

In a case of conflict of evidence, it was the province of the jury to reconcile, if possible, and if this could not be done, then it was their duty to give credit to such of the witnesses as seemed best entitled to it.

When the general policy in favor of a commission merchant bound the merchant to return a monthly report of shipments, if the bills of lading kept by the clerk of the steamboat had the mark "no insurance," but that delivered by the shipper was a clean bill, the limitation as to time of notice did not commence to run from the date of the shipment, but from the date of the discovery of the fraud.

In the case of no bills of lading, or of fraudulent and contradictory bills, formal proceedings to fix the liability of the underwriters are not necessary.

It is a well-settled principle of law, that in the ordinary policies of marine insurance, whether the same be upon the ship or its cargo, there is an implied warranty that the vessel shall be seaworthy at the commencement of the voyage insured.

And it is also well settled, that the want of an experienced master, or of a competent crew, will render a vessel unseaworthy.

An implied warranty may be modified or superseded by express agreement, as, for instance, where, by the policy, the ship is admitted to be seaworthy.

A special clause in a general policy, "on board all steamboats or vessels approved by the company," must have meant those to which the underwriters had given certificates, or which they had held out to the public as seaworthy for the purposes of the trade.

XXIX—28.

The underwriters thus selected the vessels for themselves, and left no choice to the shippers.

Any of the ordinary terms of a policy may be dispensed with by the special agreement of the parties.

Held, that upon the evidence in this case, the Betty Powell was a vessel approved by the company, and therefore seaworthy; and that, upon the evidence, the jury correctly found the underwriters liable to the shippers upon the general policy in favor of the consignee.

Appeal from Galveston.     The case was tried before Hon. Peter W. Gray, one of the district judges.

In this case the plaintiff, John H. Burnett, shipped, on board the steamboat Betty Powell, on the 13th day of May, 1859, at Beaver's and Smith's landings, on the Trinity river, (Beaver's landing being sixteen miles above Smith's,) one hundred and eight bales of cotton—sixty-three bales at Beaver's, and forty-five bales at Smith's—and consigned to Dean, Randle & Co., in Galveston, and three bills of lading for each lot of cotton were signed by the clerk of the boat.

On the 17th of May, 1859, the steamboat Betty Powell, with Burnett's cotton on board, was burned, and ninety-three bales of the one hundred and eight were consumed, as well as all the other cotton on board at the time; the boat being on her way to Galveston with the cotton.

Dean, Randle & Co., the consignees of the cotton, at the time of the burning, held a policy of insurance from the Union Marine and Fire Insurance Company, by which said company insured Dean, Randle & Co., for account of whom it may concern, from ports and places on the Trinity river to Galveston, cotton valued at $50 per bale, losses paid sixty days after proof of interest and proof of loss, one-half of all produce, &c., consigned to Dean, Randle & Co., with a special clause, as follows: "This insurance is declared to be one-half the value of all shipments to assured for sale, or in which they have an interest, between the date hereof and the 1st day of December next, on board all steamboats or vessels approved by this company, except such shipments as shall have written on the face of the bill

of lading, at the time and place of shipment, the words 'No insurance;' and it is a condition of this insurance, that the assured shall make a true return, on or before the last day of every month, of all property covered by this policy, and pay all premiums due on demand made." Policy dated 1st December, 1858.

The bills of lading received by the consignees of plaintiff's cotton had written across the face of the bill of lading from Beaver's landing the words, "No insurance," and so of the bills of lading from Smith's landing, "Insurance waived."

The bills of lading of plaintiff's cotton brought by the boat had written on the face of the bill of lading from Beaver's landing the words "No insurance," and on the face of the bill of lading from Smith's landing the words "Insurance waived."

The bills of lading retained by the shippers of the cotton were not so written on, or had no waiver of insurance.

At the time of the starting of the steamboat Betty Powell down the river on this voyage she had but two negro firemen and a mate for crew.

At the time of shipping plaintiff's cotton, she had two negroes and two white men and the mate, and one man was employed at Calhoun's landing.

At the time of the burning, the crew consisted of the two negro firemen, three white men, and the mate. The engineer says: "Two negroes, firemen, and two white men."

The captain was in a weak state of health, and a Captain Montgomery was the captain indorsed by underwriters at the time. Mauck, who was captain at the time of the shipment and burning of plaintiff's cotton, had been removed from command, and Montgomery placed in command, before the boat left Galveston; the cause of the change was the weak state of health of Mauck.

The custom of the insurers is to have a boat examined by an inspector, and, if satisfied with her soundness, he

gives her a certificate, which states that the company "will insure produce on this boat (name of master) while she remains in like good order, and while under command of the same master."

The insurance, if effected, would be insurance on cotton on steamboat Betty Powell, on a voyage from the landings to Galveston.

The report of the cotton of plaintiff was never returned by Dean, Randle & Co. to the insurance company as property covered by their policy.

.The mode of conducting the business with the insurance company was as follows: On receipt of bills of lading for produce not written off, the entry was made in their insurance book, which book, every month or oftener, was deposited with the insurance company, who from this book made their entries, and charged Dean, Randle & Co. with the premiums. When written off, no return was made and no premium charged.

This cotton was entered in the cotton-book of Dean, Randle & Co. as " not insured." No return made, and no demand for the insurance, and no premium offered.

It was in testimony, that some three weeks or a month after the burning of the Powell, John Dean received the bills of lading (not written off) from Burnett, but was not then instructed to demand the insurance of the company, "but it was left until Burnett could get further information; that he had afterwards received instructions from Burnett to claim the insurance; that he had mentioned the matter to the company, but had made no demand, because he did not think the cotton was covered by the terms of his policy.

"He talked the matter over with some of the company, and said there would be a law-suit. He told the directors of Burnett's claim, and understood it to be refused."

There was a trial by jury, under the charge of the court, January 12, 1860, and verdict for plaintiff against the insu-

rance company for $2,264 25; motion for new trial overruled, and defendants appealed.

Appellants assigned for error, that the verdict was against the evidence; that the court erred in the charge to the jury, and in refusing the first, second, and third charges asked by them, and in overruling their motion for new trial. Plaintiff's whole evidence of claim or right was the policy of insurance, testimony of appellant, Rice, and testimony of John T. Beaver, who swore that they did not instruct the clerk to waive insurance, and testimony of John T. Smith, that he did not instruct the clerk to waive insurance on the cotton shipped by him, and the clean bills of lading retained by the shippers. The case, as treated, was very much one of fact; and it is to be regretted that the point as to whether these clean bills of lading, being the only ones under the control of the shipper, did not overrule the others, which he may not have seen.

*William T. Austin,* for the appellant, argued the cause at length, and cited the following authorities:

In the case of Berry Donville v. Sun Mutual Life Insurance Company of New York, 12 La., 259, the policy read as follows:

"This insurance shall cover merchandise to the address of the assured from European ports to New Orleans, *via* Boston and New York, the risks to attach from time of shipment, which are to be reported to insurers on receipt of invoices for indorsement."

*Per curiam:* "By the terms of the policy, the party desiring to be insured was bound to present to the insurance company an invoice of the goods, and pay or secure the premium to the company. When this was done, and the amount of invoice indorsed, the contract for insurance was complete."

"No premium was offered, and if the articles had arrived in safety, the company could not have demanded

the premium, and the plaintiff under no obligation to have paid it."

In every policy of insurance for river or sea risks there is an implied warranty that the boat or vessel, at the time of commencement of the risk, shall be and is seaworthy. (1 Phil. on Insur., 4th ed., art. 695 and references, art. 707.) That she shall be well manned and officered. (1 Phil. on Insur., 'art. 709 and references; Hill. on Mar. Insur., 53, 60, 61, 62, 68, 77, and cases there cited; 8 Term., 192; 14 La., 485; 19 La., 42; 10 Rob., 334.)

It is a condition precedent; and, if the vessel lack any of the requisites to make her seaworthy for the voyage to be made at the time of the shipment and so sails, the policy does not attach. (Hill. on Mar. Insur., pages as above; Park on Insur., 2d Am. ed., ch. 11, pp. 220 to 231, and cases there cited.)

"However innocent or unfortunate the insurer might be, yet if the ship was not seaworthy at the time of insuring, there was no contract at all between the parties, because the very foundation of the contract, the ship, was in the same condition as if it did not exist."

She is not fit for the voyage, unless she sails with a crew competent for the voyage, considering its length and the circumstances under which it was undertaken; and not only must the ship and her furniture be sufficient for the voyage, but she must also be furnished at the time of sailing with a competent master, and an adequate number of persons of skill and ability to navigate her. (Abbott on Ship., 8th ed., 1854, pp. 344–450.)

A vessel is not seaworthy, if she proceeds without a pilot in navigating a river where the custom is to take on board a licensed pilot. (Abbott on Shipping, p. 451, note.)

It is a breach of the warranty of seaworthiness for a vessel to leave her port of lading abroad, or any intermediate return port, with a crew inadequate to man her. (The Gentleman, Olcott's Admiralty, 110.)

The incompetency of the master of a vessel is a breach of the warranty of seaworthiness, although the owners may have placed on board an excellent navigator and seaman as sailing-master, having the entire charge of the navigation of the ship. (4 Duer, N. Y., 234.)

*Oldham & Terrell*, for appellee.—In support of the judgment of the court below, we make the following points:

1. That, according to the terms of the open policy held by Dean, Randle & Co., the contract of insurance was complete upon the delivery of the cotton on board the steamboat Betty Powell, and the execution of the bills of lading, unless the words "no insurance" and "insurance waived" were written on the face of the bills of lading at the time and place of shipment, by the authority and direction of the plaintiff or his shipping agent.

In our view of the law, the completion of the contract did not depend upon the receipt of clean bills of lading by the company. This point, we think, is clearly decided by the Supreme Court of the United States in Tayloe v. Merchants' Fire Insurance Company, 9 How., 390, 391.

[The counsel quoted several pages of this case.]

In this case, the policy was a continuing outstanding proposition to all parties who might ship to Dean, Randle & Co., and the policy inured to the benefit of such shippers from the moment of shipment, unless the waiver of the insurance was indorsed upon the bill of lading at the time and place of shipment. The condition, "that the assured shall make a true return, on or before the last day of every month, of all property covered by this policy, and pay all premiums due upon demand made," was not a pre-requisite to the completion of the contract, but an independent stipulation growing out of the contract, and by a non-performance of which the party might defeat his claim to the benefit of the policy.

The clear object of that stipulation was, to enable the

party to ascertain the amount of premiums due, and to provide for their payment. It was intended to cover cases where there was no loss, or, in case of loss known at the time, as one of the preliminaries to a payment by the company.

But, before proceeding further upon the consideration of that point, we will consider a second position that we assume for appellee: second, that the bills of lading were not, "at the time and place of shipment, indorsed 'no insurance.'"

This proposition is one of fact; was distinctly presented to and decided by the jury. There was proof on both sides, but it seems to us that the weight of testimony was with the verdict. The clerk of the boat swore, that upon the bills retained by him he made the indorsement, under the direction of the shipping agent, but that he omitted, through mistake, to make the indorsement upon the bills handed to the shipping agent. Although the evidence is oath against oath, the circumstances are against the clerk. Had there been but one transaction, the doubt would have been greater. But there were two, precisely alike. At one landing he received a parcel of cotton, gave a bill of lading to the agent of the shipper without the indorsement, but indorsed the one retained by himself; at another landing he received another lot, under precisely the same circumstances. Each agent swears positively, that he had no authority to give, and did not give, instructions to write "insurance waived;" that it was not done at the time and place of shipment; and confirms his statement by the bill retained by him. The two transactions strengthen the testimony of the agents, and weaken that of the clerk.

[The counsel elaborated this point from the facts.]

"The objection went to the foundation of the claim, which superseded the necessity of "making the returns," as the production would have been an idle ceremony on the part of the insured in the further prosecution of his right. Why produce them after the company had denied the con-

tract and refused the policy?" (Tayloe v. Merchants' Fire Insurance Company, 9 How., 403.)

That the grounds upon which the company placed their refusal operated as a waiver of this, as well as all other preliminary proofs, is sustained by the case above cited, and by the following authorities: McMasters & Bower v. The Western Mutual Insurance Company, 25 Wend., 352; Turley v. The American Fire Insurance Company, 25 Wend., 378; Columbia Insurance Company v. Lawrence, 10 Pet., 514; Etna Fire Insurance Company v. Tyler, 16 Wend., 401, and cases there cited.)

These cases all sustain the point clearly, that, if there be a formal defect in preliminary proofs of loss and interest required by the policy or custom of the place, and which could have been supplied had any objection been made by the underwriters to the payment of loss upon that ground, if the insurers put their refusal to pay upon some other ground, the production of such proof will be considered as waived.

The case is very different from that of a special policy upon a shipment upon a particular vessel approved by the assured, not by the company, perhaps in a foreign port. In such case, the insured warrants the seaworthiness of the vessel.

But here the case is different. Here the underwriters undertake to select and approve the vessel upon which insurance of shipments should attach under the policy. As before stated, they selected the Betty Powell, and gave her a certificate of "approval." Now, while that certificate remained in force, we cannot conceive that the question of implied warranty of her seaworthiness could arise between the insured and underwriters. On the contrary, the certificate was an admission by the underwriters at the time that she was seaworthy, and the underwriters are estopped by it from setting up the contrary as a defense in this action.

Nevertheless, the question of fact, as to the seaworthiness of the Betty Powell, was distinctly submitted to the jury by the court. The court charged the jury, "that if the steamboat was not approved by the company or their inspector, or that she was not seaworthy, not sufficiently officered and manned for the voyage, and that the loss resulted or occurred by reason of such insufficiency, then find for the defendants." Upon the evidence the jury found the facts against the defendants.

WILLIE, J.—The judgment of the court below is sought to be reversed upon the following grounds: First, because it is said there was an express waiver of insurance on the part of appellee; second, because no return of the cotton claimed to have been insured was made to the insurance company, as required by the policy; third, because the steamer upon which the cotton was shipped was not seaworthy, both at the time of its shipment and of its destruction by fire.

As to the first ground, the waiver of insurance depended upon whether or not the words "no insurance," or their equivalent, were written upon the face of the bills of lading. These bills were made out in triplicate, one copy being intended for the shipper, one for the consignee, and one for the carrier. Upon the copy retained by the steamer, and upon that delivered to the consignee, the above words, or their equivalent, were written by the clerk of the steamer, whilst upon the copy delivered by him to the shipper no such waiver appears. The clerk swears that these words were written by him upon the copies above mentioned by order of the shipper's agents; the appellee proves by these very agents that no such order was given; that the insurance was not waived, and that the act of the clerk was not authorized by them, or binding upon their principal. It was a case of direct conflict in testimony, which it was the province of the jury to reconcile, if possible; and if this

could not be done, then it was their duty to give credit to such of the witnesses as seemed best entitled to it. They have chosen, in this instance, to believe the plaintiff's witnesses as to this fact, and we do not feel authorized, under the constant rulings of this court, to disturb their verdict on this account. Upon the first objection taken, therefore, the judgment should not be reversed.

The insurance not having been expressly waived by order of the appellee, were his rights forfeited by a failure to make the return required by the policy, or rather by a failure of his consignees so to do? The policy required that Dean, Randle & Co., consignees of appellant's cotton, should make a true return, on or before the last day of every month, of all cotton covered by the policy. It was established by proof at the trial, that this was not intended as a limitation for the return of all cotton shipped to Dean, Randle & Co. during the month, which was covered by insurance, but of all such insured cotton for which they had received bills of lading. And this is the only reasonable interpretation which can be given to this provision of the policy. Dean, Randle & Co. looked alone to the bills of lading received by them, to ascertain whether or not the cotton receipted for in such bills was covered by insurance or not. If they contained no words showing a waiver of insurance, the cotton was reported to the insurance company as covered by the open policy, and this report was made on or before the last day of the month during which the bills of lading were received. If the words "no insurance" appeared upon the face of such bills, no return of the cotton was made to the company. The consignees' bills of lading, in this instance, were forwarded to them on the same steamer which carried the cotton, and the shipper was induced by the clerk to believe that this would prove the most expeditious method of getting them to their destination. The clerk, without any authority, it seems, wrote upon them the words "no insurance," or their equivalent. They were received by

the consignees in this condition, and they, not knowing the true state of the facts, did not include the cotton in their monthly return to the insurance office. It was precisely as if no bills of lading for this cotton had been received by the consignees. As we have already stated, they looked to these bills for information as to whether the cotton described in them was insured or not. It was from the time that such information was received that the limitation as to the monthly return commenced to run. When these bills represented the matter falsely the return was due, not during the month in which they were received, but the month in which correct information as to the facts was conveyed to the consignees.

But in this case no regular and formal return of the cotton was ever made to the insurance company, nor do we think that such a return was necessary under the circumstances. The consignees could not state with certainty that the cotton was covered by the policy, even after they had been informed of the facts of the shipment by the owner, and had seen the bills of lading which were delivered to him. There was a conflict of statements about the matter, and the bills of lading also disagreed, and hence the consignees could not report in the usual absolute and unqualified form. All that they could report to the company was the fact, that there was such a conflict and disagreement, and that the owner would assess a claim against them for one-half of the value of the cotton destroyed. This information was conveyed to the company in substance by one of the firm of Dean, Randle & Co., and we think this all that was necessary under the circumstances.

But, thirdly, appellants say, that they are not liable, because the boat upon which the cotton was shipped, the "Betty Powell," was not, at the time of the shipment and of the loss, in a seaworthy condition; and this because it was not under command of a competent master, and was not furnished with a sufficient crew.

It is a well-settled principle of law, that in the ordinary policies of marine insurance, whether the same be upon the ship or its cargo, there is an implied warranty that the vessel shall be seaworthy at the commencement of the voyage insured. (1 Arn. on Insur., 652; 1 Phil. on Insur., § 695; Warren v. United Insurance Company, 2 Johns., 231; Taylor v. Lowell, 3 Mass., 331.)

"And it is also well settled, that the want of an experienced master, or of a competent crew, will render a vessel unseaworthy." (Copeland v. New England Insurance Company, 2 Mass., 432, 444, 445; Silva v. Low, 1 Johns., 198.)

It is equally well established, that this implied warranty "may be modified or superseded by express agreement, as, for instance, where by the policy the ship is admitted to be seaworthy." (1 Arn. on Insur., 661; Parfitt v. Thompson, 13 Mus. & Wels., 395; 1 Phil. on Insur., § 698.)

We are relieved in this case from a critical examination into the testimony for the purpose of ascertaining whether or not the Betty Powell was seaworthy at the commencement of the risk and at the time of the loss, because we believe that the implied warranty was waived by the terms of the policy itself. The open policy upon which this suit is founded covers one-half the value of shipments to Dean, Randle & Co. for sale, or in which they may have an interest, on board all steamboats or vessels approved by the company. This condition, that the boats or vessels are to be approved by the insurance company, is not found in the ordinary marine policies, and must have been inserted in this one for some special purpose. The approval contemplated by the policy must have been with respect to the fitness of the vessels to convey produce to Galveston from the ports where the risk was to commence, or, in other words, as to their seaworthiness for such voyages. No other reasonable construction can be placed upon the words used, and this is shown to be their true meaning by the

testimony of Captain J. G. Haviland, inspector for the underwriters; for his certificate in the present case was as to the fitness of this steamer to carry produce.

What could have been the object of the company in having this inspection made and certificate given to vessels found worthy, and in stating that they would insure shipments upon such vessels, and such only, unless they intended thereby to take upon themselves the burden of warranting their seaworthiness, or, in other words, to dispense with such warranty on the part of the assured? It was as if they had said, in so many words, "We have examined this vessel, and find her well suited to convey cotton to Galveston; ship your cotton on board of her, and it will be covered by our policy of insurance." The duty of the assured to see that the vessel upon which he ships is seaworthy rests upon the ground that he has the right of selecting such vessel as he may choose for that purpose. He is required to select such as are capable of making the voyage against all the ordinary obstacles to water navigation. By the above condition of the policy the underwriters deprive the assured of this privilege, and reserve it to themselves, requiring the assured to be governed by their judgment as to what steamers or vessels he shall use in the transportation of his produce. They must take the right with all its consequences, and the principal one of these is the duty of selecting a seaworthy vessel, or at least they should be regarded as relieving the shipper of his warranty in this respect. Any of the ordinary terms of a policy may be dispensed with by special agreement between the parties. (Parks v. The General Interest Assurance Company, 5 Pick., 34.) And we think that, if the above condition was inserted in the present policy for any purpose, it was to limit the responsibility of the company to shipments upon vessels which they had ascertained to be seaworthy, and thus to relieve the assured from any warranty in this respect. If it were not inserted for this purpose, then it is an unneces-

sary clause, and the policy would amount to the same thing without as with it.    In accordance with this view was the intimation of the high court of errors and appeals of Mississippi, in the case of the Mississippi Insurance Company v. Stanton, 2 Smedes & Marsh., 340, that advertising to insure goods upon certain enumerated boats would amount to a waiver of the implied warranty of seaworthiness.

The only question, then, for us to consider is, was the Betty Powell a steamer approved by the insurance company for the shipment of cotton to Galveston from ports on the Trinity river?

The testimony of Captain Haviland, who inspected her for the underwriters at Galveston, on this point, is, in substance, that he examined her in March, and gave her a certificate of fitness to convey produce, &c.; that this certificate was to hold good during a certain period of time, and the continuance of the like good condition of said vessel, and while under command of her then master; that she had such a certificate when she left Galveston to go up the Trinity; that he would not give a certificate to a vessel with an insufficient crew; that he, as such inspector, examined vessels from time to time, and, if he found one in an unseaworthy condition, revoked their certificates, but had not revoked his certificate to the Betty Powell.

There can be no doubt, then, but that at the time of her departure from Galveston on her voyage up the Trinity, the Betty Powell was a steamer approved by the company. But it is said that the certificate was only as to her condition at the time of the inspection, and availed only so long as she remained in like good condition.

The expression "steamboats or vessels approved by this company," evidently meant approved after examination by the inspector of the company, for no other method of approval is established by the evidence.    It is also plainly deducible from the testimony of Haviland, that his certificate of approval given to vessels found to be worthy was

their voucher of approval by the company, until the same should be revoked upon some future inspection by him. This certificate continued in force, and bore witness to the fact that the vessel to which it belonged was an approved vessel of the underwriters, until canceled by the same authority that gave it. All, therefore, that the shipper was required to do, in order to have his produce protected by this policy, if consigned to the proper parties, was to see that the steamer upon which he shipped it carried with her this evidence of approval on the part of the underwriters. It is not shown by the evidence that the company were in the habit of having vessels examined at any intermediate stage of their voyage, but to have them inspected, from time to time, at Galveston; and it was to the result of this last inspection at that place that the shipper must look in order to ascertain whether or not any vessel or steamer was approved, as provided by the policy. To require him to see that such steamer was in as good a condition as at the time she received the certificate, would be to impose upon him a greater burden than if no such clause were in the policy. In ordinary cases of marine insurance, the assured is bound only to see that the ship is seaworthy for the proposed voyage. Under the construction contended for by appellants, he would be compelled to put her in the same condition as when the inspector of the company examined her. At that time she might have a larger number of officers and hands than was necessary to man her for the voyage, yet the assured would be forced to see that she was thus amply supplied when his goods were shipped, in order to get the benefit of the policy.

What would be the use of the certificate and the agreement of the company to insure upon vessels approved by them, if the assured are accountable for their seaworthiness at the intermediate ports. The assured, by shipping upon such approved vessels, would be relieved of no obligation to which he would have been subjected had he shipped

by any other vessels. In fact, as we have just seen, he would have been subjected to an additional burden by so doing.

Again, if the certificate given by the inspector was good only at the time of leaving that port, it would be of no service or use whatever; for the policy proposes to insure shipments from distant ports to Galveston, and such certificates could only be of use in case of cargoes sent from Galveston to some other port.

Our construction of the clause of the policy above cited, taken in connection with the survey and certificate of the inspector, is, that this certificate was the evidence of approval contemplated by the policy; that the underwriters selected their vessel, had her surveyed and approved for the voyage before she left Galveston, and sent no one with her to see that she was in like good condition at all intermediate ports. The inspector could therefore give a certificate in no other form than that stated in the evidence; and that, when the words "approved by this company" were used, they meant approved according to the terms of the certificate given by the inspector; that they thereby held such vessels out to the world as approved by them, and thus induced shipments upon board of them, with the understanding that such shipments would be covered by their open policy of insurance. And we think that the Bettie Powell, under this construction of the policy, was fully proved by the evidence to be a steamer approved by the insurance company for the transportation of produce to Galveston from the different landings on the Trinity. And this, too, seems to have been the construction of the underwriters themselves; for they paid all other losses by the Bettie Powell without objection, and seem to have refused payment in this case only on the ground, that insurance was expressly waived by the underwriters upon the bills of lading.

We are of opinion therefore that, upon all the points
xxix—29.

made by the appellants, the judgment of the court below was correct, and it is

AFFIRMED.